## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**HORACIO OCHOA,**

> **Plaintiff,**

**vs.**                                                    **No. CIV 08-931 RLP**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

> **Defendant.**

### MEMORANDUM OPINION AND ORDER
### GRANTING PLAINTIFF'S MOTION TO REVERSE AND REMAND

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration (Commissioner) denying his applications for disability income benefits and supplemental security income.  This matter has been fully briefed by the parties.  For the reasons stated herein the decision of the Commissioner is reversed, and the matter is remanded for additional proceedings.

**I.      Procedural History**

Plaintiff's application for disability insurance benefits ("DIB" herein) and related documentation alleges that he became disabled as of October 12, 2004 due to knee, back, waist, shoulder, arm and neck pain, headaches, carpal tunnel syndrome, difficulty sleeping, depression and medication side effects.  (Tr. 102, 106, 486).  The application was denied on August 23, 2005.  (Tr. 70).  Plaintiff sought review by an administrative law judge ("ALJ").  (Tr. 71).  He was advised that the did not qualify for supplemental security income benefits ("SSI" herein) because of excess income.  (Tr. 482).  A subsequent application for SSI benefits was filed but not acted upon.  That claim was escalated in order to be heard in conjunction with his DIB claim.

The ALJ conducted an initial hearing on September 20, 2007, a supplemental hearing on

March 12, 2008, and issued an unfavorable decision on April 12, 2008. (Tr.18-29). The Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner. (Tr. 6-10). **Jensen v. Barnhart**, 436 F.3d 1163, 1164 (10th Cir.2005), **Doyle v. Barnhart**, 331 F.3d 758, 759 (10th Cir. 2003).

## II.     Standard of Review

Review of the Commissioner's decision is limited to determining whether substantial evidence in the record as a whole supports the factual findings, and whether the correct legal standards were applied. **Hamilton v. Secretary of Health & Human Services**, 961 F.2d 1495, 1497-98 (10 Cir.1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Hamilton**, 961 F.2d at 1498. Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. **Musgrave v. Sullivan,** 966 F.2d 1371, 1374 (10th Cir.1992). The court may neither re-weigh the evidence nor substitute its discretion for that of the Commissioner. **Hinkle v. Apfel**, 132 F.3d 1349, 1351 (10th Cir.1997); **Kelley v. Chater**, 62 F.3d 335, 337 (10th Cir.1995). Where the evidence as a whole can support either the agency's decision or an award of benefits, the agency's decision must be affirmed. **Ellison v. Sullivan**, 929 F.2d 534, 536 (10th Cir.1990).

## III.    Five-step Sequential Evaluation Process

The Social Security Act defines "disability" as the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment. See 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is under a disability, the Commissioner applies a five-step sequential evaluation. The steps are: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the

impairment prevents the claimant from continuing his past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. See 20 C.F.R. §§ 404.1520; 416.920. The burden is on the claimant through step four.  If step four is satisfied, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy. **See Williams v. Bowen**, 844 F.2d 748, 751 (10th Cir.1988).

The evaluation at step four includes assessment of the claimant's residual functional capacity ("RFC" herein).   This RFC assessment is used at both steps four and five.   20 C.F.R. §§404.1520(a)(4); 404.1520 (f) & (g); 416.920 (a)(4); 416. 920 (f) & (g).

## IV.   Vocational evidence.

Plaintiff was born and raised in Mexico, where he completed either the 9th or the 12th grade. (Compare Tr. 534 with Tr. 358).  Although the evidence concerning his ability to communicate in English is mixed[1], it is undisputed that he is not fluent, and there is no evidence that he can write English.  Plaintiff's primary work since 1995 has been as a custodian and maintenance technician. (Tr. 116).

## V.   Medical evidence.

Plaintiff sustained injuries in two motor vehicle accidents and one work related fall between May and October 2004.  The initial auto accident caused torn cartilage (labrum) in the right shoulder with bursitis (Tr. 197).  Medical work up also documented degenerative changes and bony contusion

---

[1]Several physicians utilized Spanish language interpreters when treating Plaintiff (Tr. 179, 247, 249, 297-298, 362) and an interpreter was used at both of Plaintiff's administrative hearings. (Tr. , 18, 530, 518). In written materials Plaintiff stated that he could not speak or understand English (Tr. 105), but at his administrative hearing testified that he could speak and read a little English, could not write in English and had difficulty understanding it. (Tr. 534). One treating physician noted that there was a language barrier but that "his English is really pretty good." (Tr. 297). The medical consultant who conducted an independent medical evaluation stated that he spoke some English, and that he wife acted as his interpreter. (Tr. 362).

3

of his right knee  (Tr. 190), degenerative changes in at L5-S1 and the facets from L4 through S1 (Tr. 245, 179), disc protrusion at C3-4 (Tr. 244) and bilateral carpal tunnel syndrome. (Tr. 185-187).  An MRI performed in August 2004 on his right knee showed degenerative changes in the medial meniscus, focal bone contusion, with trabecular fracture line and chondral thinning and fissuring. (Tr. 190).  Plaintiff then  injured his left knee in a work related fall on September 24, 2004. (Tr. 269, 254).   Physical therapy initiated in October indicated he had suffered knee strain with probable hamstring strain, patellar tendonitis and possible internal derangement.  (Tr. 275-276).

Thomas Pazik M.D.,  a knee and shoulder specialist, surgically repaired the torn cartilage in Plaintiff's right shoulder on October 12, 2004.  (Tr. 181-182, 291).

Plaintiff was involved in a second motor vehicle accident on October 29, 2004, and was seen in an emergency room with complaints of pain in the neck, low back, right shoulder and  hip. (Tr. 211- 214).   The following week an MRI of his left knee disclosed intrasubstance bruising of the medial meniscus without a through and through tear.  (Tr. 256, 254).   An examining orthopedist[2] diagnosed patellofemoral contusion with post traumatic chondromalacia, but noted that Plaintiff had good knee stability and minimal joint effusion.  He recommended that Plaintiff not kneel, climb, squat or crawl, but stated he could work on his feet otherwise.  (Tr. 254).   Plaintiff's knee complaints continued, and on December 17, 2004 he had arthroscopy of the left knee with partial medial meniscectomy.  (Tr. 252-253).  On  December 27, 2004 his workplace treating physician, Rosalinda Pineiro, M.D., addressing only Plaintiff's work related  knee injury, indicated he could perform modified duty that involved "no squatting, no kneeling and no prolonged standing/walking longer than tolerated."  (Tr. 265).

---

[2]Roger M. Sobel, M.D.

In early December, Plaintiff complained to Dr. Pazik of worsening pain in his neck and right upper extremity. His right arm was slightly edematous, cervical range of motion was guarded and limited, and he had decreased sensation in the median and radial sensory nerve distribution Tr. 289). MRI of the right shoulder was subsequently interpreted by Dr. Pazik as essentially normal, except for some tendinosis of the biceps tendon and rotator cuff. (Tr. 288; compare with Tr. 230-231). By December 31, 2004 Plaintiff developed vasomotor symptoms in his right arm initially diagnosed by Dr. Pazik as regional sympathetically mediated pain syndrome, also known as reflex sympathetic dystrophy (RSD), causing significantly limited range of right shoulder motion. (Tr. 287-288).

Plaintiff was evaluated for persistent wrist pain by orthopedist Randy Bussey M.D., on December 12, 2004 and January 10, 2005. (246-248). Dr. Bussey diagnosed a contusion to the marrow of the lunate (wrist bone), carpal tunnel syndrome on the right, and RSD. He recommended sympathetic nerve block injections, indicating that surgery was contraindicated. Dr. Pazik concurred. (Tr. 286).

Plaintiff instituted a course of nerve block injections and medication to treat neuropathic pain through Brad Sisson, M.D.[3], as well as physical therapy. (Tr. 299-302; 321-322, 327-327). On June 8, 2005, Dr. Sisson stated:

> . . .He is doing fairly well. His RSD symptoms have decreased about 50% since his last stellate ganglion block. He is doing hand therapy, but he continues to have radicular symptoms in his upper extremity that may be due to bony spurring at the C6-7 motion segment according to his physical therapist and Dr. Manter. . . .
>
> OBJECTIVE: On physical examination, he has decreased stigmata of complex regional pain syndrome with trace to no mechanical allodynia. There is no marked edema or erythema. He complains of radicular symptoms in the ulnar distribution of his upper extremity. . . .

---

[3]Dr. Sisson's letterhead indicates that he is board certified in anesthesiology and pain management. (See, e.g., Tr. 438).

(Tr. 321).

Dr. Sisson reviewed a December 2004  MRI study of Plaintiff's cervical spine, and noted that it showed "a C6-7 bony spur with a broad-based disc protrusion causing right-sided C6-7 foraminal stenosis." Id.  Dr. Sisson diagnosed C6-7 foraminal stenosis and post surgical pain syndrome of the right arm, and  recommended a C6-7 selective nerve block. Id.  This block  was performed on July 7, 2005.  (Tr. 430).

Plaintiff was evaluated by Gregory Denzel, D.O., on July 25, 2005 at the request of the Social Security Administration.  (Tr. 358-361).  Dr. Denzel reviewed medical records including the MRI showing disc protrusion in the cervical spine.  He commented that Plaintiff was in significant discomfort when asked to do range of motion of his neck, low back and both shoulders, but that he gave good effort and there did not appear to be  any symptoms magnification.  Physical examination findings included:  Joint line tenderness in the left knee; inability to toe/heel without significant pain and assist[4]; restricted ability to squat; normal strength testing of the elbows, shoulders, neck, hands, wrists, hips and knees with no giveway weakness; normal range of motion for all joints except cervical spine and right shoulder, the shoulder limitation being "very significant and consistent." (Tr. 360).  Dr. Denzel felt that Plaintiff suffered from RSD of the right shoulder, degenerative joint disease of the knees and chronic neck and lower back pain.  He stated that Plaintiff "should be restricted from overhead work, use of the right upper extremity, lifting more than 20 pounds or pushing/ pulling more than 30 pounds with the left upper extremity, repetitive bending, stooping, squatting, climbing and crawling or operating commercial vehicle or having (sic) machinery.  In addition, Dr. Denzel stated that Plaintiff "probably would be unable to tolerate even sedentary

---

[4]The ALJ misinterpreted or misquoted this finding in his decision, stating that Plaintiff "could walk on heels and toes without significant discomfort."  (Compare Tr. 359 with Tr. 24).

activities for a full eight-hours shift, and would probably be restricted to four-hour shift until his RSD in under better control."  (Tr. 360-361).

On July 27, 2005 Dr. Sisson sought a neurosurgical consultation from  John Viola, M.D., as to whether Plaintiff should have surgery correct the C6-7 motion segment.  In describing Mr. Ochoa, Dr. Sisson stated that he "presented with stigmata of RSD in the right upper extremity after a failed surgery."  (Tr. 438).

Dr. Viola examined Plaintiff on August 31, 2005, and stated:

He demonstrates pain extending down his arm in a radicular fashion, that seems suggestive of nerve root compression at approximately (the C6-7) level.

* * *

(He) has giveaway difficulties with assessment of strength about the right shoulder, as well and the biceps and triceps, seems to have mild weakness in finger extension which may suggest a C7 radiculopathy on the right side, he has some giveaway with assessment of finger abduction and adduction and hand intrinsic strength.  He did not appear to have any prominent vasomotor symptoms at this point in time from the reflex sympathetic dystrophy.

(Tr. 446-447).

Dr. Voila obtained a new MRI study of the cervical spine which he and the radiologist read as essentially normal.  He referred Plaintiff back to Dr. Sisson for continued symptomatic care.  (Tr. 444-447).

Non-examining physician Allen Ketelhohn, M.D., prepared a functional capacity assessment of Plaintiff on behalf of the Social Security Administration on August 19, 2005.  (Tr. 170-177).  He rejected the limitations expressed in  Dr. Denzel's report[5] and concluded that Plaintiff could

---

[5]Dr. Ketelhohn based this rejection on three stated reasons: 1) Dr. Denzel did not note RSD findings in his report; 2) Dr. Denzel did not note the presence of any back spasms, and 3) a treating physician (Dr. Sisson) had found Plaintiff much improved in  June 2005.  (Tr. 176).  Dr. Ketelhohn ignored the working diagnosis of RSD by several treating physicians, the presence of back spasms in the records of Plaintiff's primary care physician (see p. 9, infra.), and that while Dr. Sisson found Plaintiff to be "doing fairly well" on June 5, 2005, he continued to administer nerve blocks to treat neuropathic pain.  Dr. Ketelhohn also did

7

lift/carry/push/pull 20 pounds occasionally and 10 pounds frequently; stand/walk for 6 hours in an 8-hour day; sit for 6 hours in an 8-hour day with postural shifting, and had a limited ability to reach over head with his right arm.

Plaintiff returned to Dr. Sisson on September 26, 2005.  In addition to his continued complaints of neuropathic pain, Dr. Sisson noted mild stigmata of RSD with diminished strength of his triceps and hand.  Dr. Sisson stated that "typically the weakness associated with (RSD) is secondary to diffuse atrophy or guarding from neuropathic pain.  In Mr. Ochoa's case, I really feel his symptoms are really more radicular in nature."  (Tr. 437).  Dr. Sisson prescribed medications, performed a C7 selective nerve root block and recommended repeat EMG and peripheral nerve conduction studies to rule out thoracic outlet syndrome.[6]  (Tr. 436-437).

Plaintiff returned to Dr. Sisson on October 18, 2005 reporting that the nerve block had reduced his pain by 50%.  Dr. Sisson noted that this decrease in pain following nerve block was reproducible, indicating that if Plaintiff had had RSD, that condition had resolved, and that his continuing pain complaints were likely due to a disc problem at C6-7.  He repeated an epidural steroid injection for symptom management  and asked Plaintiff to return to Dr. Voila for additional surgical work up.  (Tr. 436).

Dr. Sisson also referred Plaintiff to Stephen Annest, M.D., a board certified vascular surgeon, who evaluated Plaintiff on February 14, 2006. (Tr. 453-457).  Dr. Annest's examination documented

_____

not have the benefit any medical records generated after his evaluation, which substantiate the diagnosis of brachial plexus injury with resulting weakness of the upper extremities.

[6]"Thoracic outlet syndrome is an umbrella term that encompasses three related syndromes that cause pain in the arm, shoulder, and neck . . . :  neurogenic TOS (caused by compression of the brachial plexus), vascular TOS (caused by compression of the subclavian artery or vein) and nonspecific or disputed TOS (in which the pain is from unexplained causes). . ."  http://www.ninds.nih.gov/disorders/thoracic/thoracic.htm

decreased range of motion of the neck, diffuse tenderness over the musculature of the neck and shoulders, irritation of the median, radial and ulnar nerves, diffuse weakness of the right upper extremity, and brachial plexus irritation, right greater than left.  Dr. Annest felt that while Plaintiff continued to show some evidence of RSD, it was not a major finding.  (Tr. 452).  He recommended that Dr. Sisson perform additional nerve blocks and that a supplemental EMG study be obtained.  (Tr. 433, 427, 432, 452).  Plaintiff returned to Dr. Annest in May 2006, with severe arm weakness and pain.  (Tr. 451).  Physical examination showed "decreased range of motion of the neck, tenderness over the chest wall including the rhomboids and trapezius, weakness of the upper extremity with the right side markedly weaker than left, irritation of the brachial plexus on palpation right side, and irritation of the brachial plexus with abduction of the arm and sensation of the elbow."  Id.  Dr. Annest felt that Plaintiff demonstrated "significant irritation of the brachial plexus," but that he could not recommend appropriate therapy without a current EMG study.  Id.  Plaintiff was unable to afford this study.  (Tr. 468, 540).

Throughout the time Plaintiff consulted with specialists he also obtained care from his primary care physician Charles Manter, D.O.  (Tr. 179, 294, 308-320).  In addition to noting Plaintiff's pain complaints,  Dr. Manter's  consistently noted decreased cervical range of motion, as well as periodic muscle spasm[7] and point tenderness throughout the spine.  (See, e.g. Tr. 310, 320, 319, 313, 408, 404, 397, 395, 389, 387, 381, 379).

Dr. Manter submitted answers to a medical questionnaire in August 2007[8] stating his opinion

_____

[7]Mild paravertebral muscles spasm was also noted by one-time examining physician, David Yamamoto M.D. (Tr. 463).

[8]Dr. Manter stated in his report that he was not certified to perform disability evaluations.  (Tr. 480). The ALJ referred to this statement in his decision, but did not indicate what significance he attached to it. (Tr. 26).  Social Security regulations do not require that a physician be certified to perform disability evaluations

that Plaintiff could occasionally lift/carry 5 lbs; stand 2-4 hours at a time; walk 2-4 hours at a time;

sit 4-6 hours at a time; required postural changes every 30-60 minutes to relieve pain,  could never

kneel, could frequently reach, and could perform all other postural positions occasionally.  (Tr. 478-

480).  Dr. Manter submitted the following clarification of this assessment on October 1, 2007:

> I would restrict lifting to 10-15 pounds on an occasional basis.  This is due to
> problems with both shoulders, degenerative disease of the cervical spine and the right
> arm where patient has demonstrated significant loss of movement and weakness.
>
> Standing and walking are limited due to lumbar disc disease and right knee.  Right
> knee MRI shows condromalasia (sic) and degeneration, which means he has bone-on-
> bone rubbing and pain with movement.
>
> I suggest Mr. Ochoa alternate postural position every 30 to 60 minutes to relieve pain.
> Specifically, a sitting position with degenerative disc disease increases pressure; after
> 30 to 60 minutes, he should get up and move around, and this serves to stimulate
> circulation.  Merely standing is not sufficient to accomplish this.  The amount of time
> he needs to be up and moving is subjective, but I would estimate maybe 5 to 10
> minutes at a time.
>
> Right arm and hand demonstrate weakness and lack of range of motion. I would
> restrict reaching and handling to an occasional basis only.  I have observed him in the
> office where he has significant difficulty, for example, putting on a coat because of
> right-arm limitations.  Therefore I would suggest that activities like operating
> machinery and hand controls would be limited.  The problems in his right hand are
> probably more elated to cervical disc disease.

(Tr. 481).

## VI.  Plaintiff's Testimony

Plaintiff described his pain complaints and daily activities.  Significant for this appeal,

Plaintiff testified that he could sit for 30-45 minutes at a time, stand for 15 minutes at a time, must

get up and walk, or sometimes lie down  after sitting or standing for the times indicated,  walk for

3-4 blocks, can lift or carry 5-10 pounds, can not lift over his head and  has trouble using his hands

---

for his or her opinion to be considered.   20 C.F.R. §§404.1513 & 404.1527.

and drops things.  (Tr. 541-542).

## VII.   Vocational Testimony

Vocational testimony was initially obtained through answers to written questions, after the initial administrative hearing. (Tr. 162-169).  After describing Plaintiffs past work as heavy and medium, the VE responded to a hypothetical question that asked him to assume an individual of Plaintiff's age (46) education (12 years) and past work experience, who could sit 30-45 minutes at a time, stand for 15 minutes at a time, walk 3-4 blocks, lift or carry 5-10 pounds one time, with limited ability to reach overhead but able to manipulate the fingers of both hands.  Most of these factors were obtained from Plaintiff's testimony.  The VE indicated that this individual  would not be able to perform Plaintiff's past relevant work, but could perform the sedentary jobs of Bench repair, Press operator and Jewelry assembler, all of which allowed a sit/stand option.

The VE's report also stated that with these restrictions, an individual would also be able to perform the jobs at the light exertional level.

Plaintiff's counsel requested a supplemental hearing to cross-exam the VE.  (Tr. 166-167).  At the supplemental hearing, the ALJ limited Plaintiff's counsel to one hypothetical question.  (Tr. 522).  The VE was asked to assume additional limitations contained in Dr. Manter's clarified report:  Occasional handling and reaching with his dominant right upper extremity, and the need to get up and walk around every 30-60 minutes, for 5-10 minutes.  The VE testified that the handling and reaching limitation would eliminate the jobs identified, but that the need to walk as described would not.  (Tr. 522-523).

### VII.   Issues raised.

Plaintiff contends that:  (1) the ALJ's finding that Plaintiff can perform light work is contrary to substantial evidence; (2) the ALJ's failure to adopt the VE's testimony regarding jobs for an

individual with Plaintiff's reaching limitations was contrary to substantial evidence; (3) the ALJ's

finding that Plaintiff is literate is contrary to the evidence and renders reliance on the VE testimony

contrary to law; (4) the ALJ's finding that Mr. Ochoa's skills were transferable to the jobs identified

by the VE was contrary to the evidence and the law; (5) the ALJ's credibility finding is supported

by substantial evidence and contrary to law.  (Docket No. 18, p. 3).

**VII.    Discussion**

The ALJ's decision, although lengthy and detailed, suffers from confusion and inconsistency.

The ALJ found that Plaintiff's only severe impairments were chronic neck pain and left knee pain.

(Tr. 21).  However in his opinion the ALJ catalogues Plaintiff's extensive medical care, noting and

apparently accepting diagnoses of carpal tunnel syndrome (Tr. 22), restricted motion of the right

shoulder (Tr. 24), shoulder pain and numbness associated with brachial plexus irritation (Tr. 24-25),

chondromalacia of the right knee (Tr. 25), and partial substance tear of the rotator cuff of the left

shoulder.  (Tr. 25).

The ALJ stated that Plaintiff has the RFC for substantially both a **full** range of light work (Tr.

25) and  a **limited** range of light work.  This inconsistency is further complicated by the ALJ's failure

to describe the functional components of Plaintiff's RFC.  Agency rulings require an ALJ to provide

a narrative discussion describing how the evidence supports his conclusion as to RFC. See SSR

96-8p, 1996 WL 374184, at *7. The ALJ must

> discuss the individual's ability to perform sustained work activities in an ordinary
> work setting on a regular and continuing basis ... **and describe the maximum
> amount of each work-related activity** the individual can perform based on the
> evidence available in the case record.

Id.  (Emphasis added).  A function-by-function evaluation is necessary in order to arrive at an

accurate RFC. Id. at *3-*4 ("[A] failure to first make a function-by-function assessment of the

[claimant's] limitations or restrictions could result in the adjudicator overlooking some of [the claimant's] limitations or restrictions."). The ALJ's decision does not contain a function by function assessment. The ALJ "must also explain how any material inconsistencies or ambiguities in the case record were considered and resolved." Id. Here, the ALJ cited to the various RFC assessments made by treating, examining and non-examining physicians, but did not resolve the inconsistencies among those assessments.

The ALJ could not properly rely on the VE's testimony that a person with Plaintiff's limitations could perform light exertional jobs. The DOT defines the strength requirements for light work as follows:

> Light Work - Exerting up to 20 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects.

See, e.g., **Dictionary of Occupational Titles**, 701.687-010, Assembler.

These exertional requirements are clearly in excess of the requirements posed in the hypothetical question to the VE. The ALJ was required to investigate and elicit a reasonable explanation for this conflict between the DOT and VE's report before he could rely on that testimony as substantial evidence to support a determination of nondisability. **Haddock v. Apfel**, 196 F.3d 1084, 1091 (10th Cir. 1999). See also SSR 00-4p, 2000 WL 1898704, at *4 ("When vocational evidence provided by a VE ... is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE ... evidence to support a determination or decision that the individual is or is not disabled.").

Finally, the ALJ erred in his evaluation of Plaintiff's credibility. It is well established that "[c]redibility determinations are peculiarly the province of the finder of fact, and we will not upset

such determinations when supported by substantial evidence." **Kepler v. Chater**, 68 F.3d 387, 391

(10th Cir.1995) (quotation omitted). "However, findings as to credibility should be closely and

affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id.

(quotation and alteration omitted).

>   The ALJ included his credibility analysis in his evaluation of Plaintiff's RFC  stating:

>   After considering the evidence of record, the undersigned finds that the claimant's
>   medically determinable impairments could reasonably be expected to produce the
>   alleged symptoms; however, the claimant's statements concerning the intensity,
>   persistence and limiting effects of these symptoms are not credible to the extent they
>   are inconsistent with the residual functional capacity assessment **for the reasons
>   stated below.** (Emphasis added). (Tr. 26).

The ALJ then referred to the functional assessments of Dr. Manter[9], the history given to Dr. Denzel

and Plaintiff's own history and testimony regarding his exertional abilities and daily activities.  He

did not directly discount or reject any of this evidence.   The ALJ did refer to Plaintiff's shoulder

limitation in assessing credibility, stating:

>   In terms of the claimant's right shoulder limitations, the objective medical evidence
>   does not support the claimant's allegations of pain.  Giveaway is noted in several
>   different examinations.  Only one of his treating medical sources has provided any
>   opinion that he is not recovered from the surgery and is able to use his right arm.  No
>   extensive atrophy or loss of muscle strength has been documented.

(Tr. 27).

This rationale fails to apply correct legal principles and is not supported by substantial evidence. It

is well established that an ALJ oversteps his bounds when he substitutes his medical judgment for

that of a treating physician.  **Winfrey v. Chater**, 92 F.2d 1017, 1022 (10th Cir. 1996).   The ALJ

---

[9]The ALJ concluded his credibility evaluation, stating "Even one of his treating medical sources, Dr. Manter did not say that the claimant could not work an 8-hour day."  (Tr. 27).  The double negative used by the ALJ is difficult to understand.  Clearly, however, the Tenth Circuit has long held that "[t]he absence of evidence is not evidence." **Thompson v. Sullivan**, 987 F.2d 1482, 1491 (10th Cir.1993).

interpreted notations of "giveaway" in physical examinations of Plaintiff's right shoulder as undermining Plaintiff's testimony regarding pain.  The significance of giveaway weakness is an issue that requires medical expertise.  **See** William Wesley Campbell, Russell N. DeJong and Armin F. Haerer, **DeJong's The Neurological Examination**, 6th Ed., p. 348.  The two physicians that noted giveaway weakness of Plaintiff's shoulder did not conclude that Plaintiff's shoulder condition did not cause pain.  On the contrary, Dr. Pazik stated that Plaintiff had "a chronic pain and RDS-like condition" (Tr. 284) and Dr. Viola noted that Plaintiff "demonstrated pain extending down his arm in a radicular fashion . . . suggestive of nerve root compression, " and diagnosed C-7 radiculopathy. (Tr. 446).  In terms use and the strength of the right arm, the ALJ ignored Dr. Annest's findings of weakness of both upper extremities, right markedly weaker than left (Tr. 451).

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse and Remand for a new hearing  (Docket No. 18) is granted.  On remand  the Commissioner shall:

(1)     Permit Plaintiff to supplement the record with updated medical records.

(2)     Comply with SSR 96-8p in documenting his evaluation of Plaintiff's residual functional capacity;

(3)     Reassess Plaintiff's credibility;

(4)     Utilize the services of a vocational expert.  That expert will consider all vocational factors, including Plaintiff's level of  literacy and ability to communicate in English.

RICHARD L. PUGLISI
United States Magistrate Judge
(sitting by designation)

15